# CIRCUIT COURT NO. 2 OF BALTIMORE CITY

Filed October 25, 1892.

2d Vol. Code (1888), p. 1404, Sec. 276 (Code 1924, Art. 93, Sec. 293).

JOHN A. HAMBLETON

VS.

THE BALTIMORE CITY PASSENGER RAILWAY COMPANY.

*Wm. A.* and *D. K. Este Fisher* for plaintiff.

*Arthur W. Machen* for defendant.

WICKES, J.—

When Miss Cordelia Hollins died, her executors found belonging to her estate, eighty-five shares of the old stock of the City Passenger Railway Company, of this city, and a subscription for eighty-five shares of the new stock of the same company made at her request by her agents, McKim & Co. Mr. Hollins McKim, a member of the firm, was also executor of the will of Miss Hollins. In the settlement of the estate he sold to Mr. John A. Hambleton, the complainant in this cause, both the old and the equitable interest of the decedent in the new stock. The company defendant transferred upon its books the old stock and issued to the complainant a certificate, but declined to transfer to him upon its books the new stock subscribed for, and duly assigned to him by the executor.

At the time the complainant made his demand upon the company for a transfer of the new stock, the refusal was placed upon the ground that until the entire amount of the subscription price of the stock was paid up in full, the company did not intend to issue any certificates or make any transfers upon its books. At that time no money had been paid upon the subscription, and no call had been made by the company for any part of it, as is still the case.

The company defendant, however, in its answer to the bill of complaint and in the argument of the case, sets out a number of additional reasons why the subscribers themselves to this stock are not entitled to transfer it in any way, and especially why this defendant should not be permitted to have the stock in question transferred to him.

We will briefly examine the reasons as they are presented:

It is first urged that a distinction must be taken between a subscription to original stock and a subscription to new stock; that while the one qualifies subscribers to become stockholders at once, so that they may immediately act as necessary constituent parts of the corporation, that in the case of new stock no such necessity exists, and that the subscription is to be considered purely as a *contract* between the corporation and the subscribers, respectively, who are only *"intending purchasers"* of the stock to be issued. That so long as it is executory, it is a contract and nothing more.

Again it is urged that the contract in this case is entirely personal on the side of the subscriber, and that the company has never *accepted* any of these subscriptions, and is hence not bound to recognize them, much less in the hands of those to whom the original subscribers have assigned their rights.

There is undoubtedly a different rule applicable to the two classes of subscriptions as stated, but it is difficult to see how the difference effects any principle applicable to this case upon its facts. Subscribers to original stock, before the formation of the corporation, contract with each other, and not with the company, for it has at that time no existence. The statutory subscription is merely the method of bringing the association into being, but a subscription for stock made after the organization of a corporation does not *ex proprior vigore* constitute a subscriber a member of the corporation until it has been accepted by the corporation.

But when the subscription to stock has been accepted or in any way becomes binding upon the company as well as upon the subscriber, the effect is to constitute the subscriber a shareholder immediately, and that too, whether any money has been paid upon the stock or not. Of course a subscriber must pay the instalments upon the stock as they become due or he is in default—but in the absence of any omission on his part to comply with his contract, certain rights and liabilities flow from this contract, which are well defined in the textbooks and cases.

Nor is this relation affected by the fact that no money has been paid upon the subscription. In Spear vs. Crawford, 14 Wend. 20, it was held that *subscribers* to stock who had paid nothing were liable to creditors under a statute making *stockholders* liable. The Court said "The subscription puts it in his power to become a stockholder in the broadest and most unqualified sense of the term, by compelling the corporation to give him the legal evidence of his being a stockholder upon his complying with the terms of the subscription."

Much must of course depend upon whether in the case before us, the company defendant is to be regarded as having accepted in advance the subscriptions to the new stock, or whether they must yet do some act to bind the company.

The facts are briefly as follows:

The company defendant procured an act of Assembly (Acts 1890, page 295) authorizing it to increase its capital stock and it is provided in the act that the stock shall be issued at its par value "paid for in money, as and when the Board of Directors shall call for the same," and that "all the *shareholders* of the said company *shall have the privilege of subscribing for the said new or additional stock ratably and in proportion to their respective holdings.* This act was approved April 3, 1890.

On July 2d, 1891, the stockholders of the company defendant met and decided to issue forty thousand shares of stock at par and give to the stockholders the privilege of subscribing for it, share for share, according to their holdings. A circular was sent to each shareholder stating these facts and calling their attention to the further facts that the right to subscribe was valuable—that the payment for the stock would be called in instalments only as needed for construction expenses and that the first instalment of two and a half dollars per share would not be called before September 1, 1891. At this time the company gave notice in the newspapers of this city of its action, and stated that the Board of Directors had "allotted the additional stock" among the shareholders share for share, and "requested the said stockholders" to subscribe for their respective shares, &c.

Miss Hollins was therefore entitled by the very terms of the Act of Assembly and became a subscriber for this stock, because that privilege was given to the old shareholders of whom she was one. The company advised her by its circular that the privilege was a valuable one, and that the terms of payment would be made easy, and by public notice through the press notified her that the shares had been *"alloted,"* and requested her to subscribe for them. The company then opened a book for "Subscriptions to the additional issue of stock, July, 1891."

At the top of the page is written, "We, the undersigned, hereby subscribe for the number of shares of additional stock set opposite to our name, respectively," and below among others was the name of "Hollins, Miss Cornelia D., 85," and opposite to this under date of July 30, "McKim & Co., 85."

It is difficult to imagine what further action could well be taken by the company to render this subscription valid and binding upon it. There is nothing the company *can* accept unless it be the money, as it is called. It allotted Miss Hollins eighty-five shares of stock and requested her to subscribe for it. She could have declined to do so had she chosen, but *she accepted* the offer and that seems to be the end of it. If Miss Hollins had *applied* to the company for this stock, and the shares had been allotted to her and notice given her of the fact, the cases rule that the contract would be complete. What conceivable difference can it make that the allotment was first made coupled with notice, and the company's request accepted by her and acted on at her request by her agent?

This conclusion goes to the very root of the controversy in this case. That the stock is not paid for in whole or in part, does not effect the rights of the subscribers. They are not in default, because no demand has been made upon them by the company. The company has stated in its circular, and still insists that this is because of its consideration for the convenience of the subscribers, then surely they ought not to be placed, as the alternative, at the grave disadvantage the policy of the company imposes upon them.

Bound by their subscription to pay the contract price for this stock, no matter what may happen to the company—for if disaster shall overtake it, they will still be compelled to pay every dollar to its creditors, and yet have no right on their side to sell or part with it, no matter what the inducement or the suggestion of convenience may be, is scarcely in keeping with the rules of law or equity applicable to such cases.

More than a year has passed since these subscriptions were made, and yet, according to the company, only one side is bound. Not even estates can be settled up, for it is obvious that but for the action of the executor in this case, the estate of Miss Hollins could not have been closed.

It is no answer to this to say as has been said that the company will be put to inconvenience by permitting such transfers to be made. It ought to have considered this before it invited subscription so far in advance of its needs. One of the very objects of the creation of corporations, and the grant of authority to issue stock, is that transfers shall be made with all practicable facility (5 Dillon 372).

In the case of the company defendant, the act of incorporation provides that the capital stock "shall be deemed personal property, and shall be transferable on the books of the corporation in such manner as the by-laws shall prescribe," and the by-law in force at the time the demand of the complainant was made provides that the "certificates or evidence of stock shall be transferable at the pleasure of the holder in a suitable book or books to be kept by the company for that purpose, &c."

There is therefore, nothing in the charter or by-laws to relieve the company from the operation of the ordinary rule of law governing corporations.

It cannot well be doubted that unless there is something disqualifying in the case of the complainant, that he is entitled to have the new stock which he has bought and paid for, and which has been assigned to him, transferred on the books of the company, subject, of course, as all the cases decide, to the equities existing between the original subscriber and the company.

But it is said that Messrs. McKim had no authority to make the subscrip-

tion for Miss Hollins, and that the company is not bound to recognize it. The company accepted it when made, and the evidence clearly shows that express authority was conferred upon them by Miss Hollins to enter into this engagement for her.

Again, it is said the sale of the new stock by the executor was not directed by the Orphans' Court, as is required by the Act of 1843, and certainly this branch of the case is not free from difficulty. The language of the act forbids the sale of a decedent's property without an order of the Orphans' Court, provides that such sales shall be void and that no title shall pass to the purchaser. 2 Vol. Code, page 1404, Sec. 276.

It is well known that this legislation was intended to stop any abuse by executors and administrators of the common law power under which they sold improvidently at times, needing no authority from the Court to pass a good title to the purchaser.

But the Maryland cases are silent as to the proper scope and meaning of this act, and we can only rely upon somewhat analogous decisions found elsewhere.

In this case the Orphans' Court ordered the sale of the eighty-five shares of stock for which the decedent held a certificate, but said nothing about the subscription to the new stock. The eighty-five shares were sold at a price which confessedly embraced the subscribed stock, and it was the undisputed intention of the parties that it should do so. Later on the executor presented a petition to the Court setting out these facts, and the Court passed an order approving the sale and transfer.

In addition to this, all those who were entitled to the residue of the estate of Miss Hollins, have joined in a ratification of the sale, thus saving harmless all who were concerned in this transaction from any pecuniary liability to them, so that all that can be done has been done to remedy the defect.

It is contended, however, that the company is estopped from setting up such a defence at this time, and is bound by the reason it assigned at the time of the demand made by the complainant to have this stock transferred; and again, that the omission alleged here cannot be inquired into in this collateral proceeding. I do not quite appreciate the force of either contention under the facts of this case, although there is abundant authority for the proposition that the decree of a Court of competent jurisdiction cannot be inquired into collaterally. But is this a collateral proceeding within the meaning of the rule, involving as it does, the title of the complainant to the stock in question?

But it is by no means clear that the Orphans' Court may not ratify with effect such a sale as was made in this case, and indeed it is said that it is the practice of the Court to cure omissions in its orders in this way. Certainly no stronger case can be presented for the application of such a rule than the one under consideration.

In Klingersmith vs. Bear, 2 Watts 486, a sale of real estate after the expiration of the order granted by the Orphans' Court, and after the term to which it was returned, was held not to be void because confirmed by the Court.

In Mussleman's Appeal, 65 Pa. St. 480, the executor sold real estate without the order of the Court, as required by the Statute, the sale was afterward ratified and the Court held that the Orphans' Court may ratify such sale in cases where it would confirm if made under previous order. And the Court added, "on general principles a power to order would include a power to ratify."

Bearing in mind the evil intended to be remedied by the adoption of the statute—that the judgment of the Orphans' Court and not that of the executor shall regulate such sales—the intention of the parties that the sale of the old stock should carry with it the new, and the subsequent ratification by the Orphans' Court of the sale, upon the petition of the executor, in which he states to the Court that by the custom of the Stock Board a sale of the old stock carries with it the privilege of the new, and is embraced in the price asked for the old, presents certainly a strong case for giving effect if it may be done, to the action of the Court. In the absence of any authority to the contrary, I shall apply the principle that the power to order a sale under such circumstances includes a power to ratify it when

made without such order, and that hence the ratification by the Orphans' Court in this case remedies the omission to first obtain a technical order of sale, describing the new stock as such.

A further question has been raised touching the jurisdiction of the Court, the appropriate remedy being, it is said, an action at law to recover damages. The case of the City Passenger Railway Company vs. Sewell, 35 Md. 251, is relied upon in part for this proposition. It seems to be an authority the other way.

Then, as now, the company defendant started out with the proposition that there was *"no stock"* to transfer, and the contention it made at that time was that a Court of Equity was the proper tribunal, and that the plaintiff erred in resorting to a Court of law. The Court sustained the suit at law, but it said nothing to indicate an opinion that the plaintiff might not have proceeded in equity to have his stock transferred, instead of at law to recover damages. In Pomeroy's Equity (1412 new Edition), the latest authority on this subject, in discussing the refusal of corporations to transfer or issue stock, the author says, "it is well settled that although the law may give some remedy, as that of damages for the refusal, equity has jurisdiction to compel the corporation to make the transfer, &c." See also Cook on Stock and Stockholders, Sections 60, 390 and 391.

1, Morawetz on Corporations, Section 220, and cases cited.

The rule which may be gathered from the cases seems to be this: If a holder of stock which a corporation refuses to transfer, is willing to part with it and accept in lieu thereof, damages which represent its market value, he may sue at law and recover. But if he desires to retain his stock, his remedy is then in equity to compel its transfer. In this case the market value of the new stock would be an inadequate compensation, for the company insists that it is worth more than it is supposed to be, and that one of the reasons for refusing to make it transferable has been the desire of the company to protect its subscribers, by preventing them from parting with their subscription rights. But, however, commendable this purpose may be, it is beyond the proper functions and powers of the board. The stockholders must be permitted to regulate their own interests, and dispose of this as of other personal property, unfettered by any unauthorized interference with their rights.

While the plaintiff prays other relief in his bill, he only insists that the eighty-five shares of new stock shall be transferred to him on the books of the company defendant.

To this relief he is entitled, and a decree will be signed accordingly with the views expressed in this opinion.